UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

01 OCT 24 PM 2: 59

PARNELL TURNER, )
)
    Plaintiff, )
)
    vs. )   CV 01-BU-0337-E
)
NHB INDUSTRIES, INC., )
)
    Defendant. )

ENTERED

OCT 2 4 2001

## MEMORANDUM OPINION

This case is presently before the Court on Plaintiff's motion for summary judgment and Defendant's motion for summary judgment, as well as Plaintiff's motion to strike portions of a declaration submitted by Defendant (Doc. 51), and Defendant's motions to strike affidavits submitted by Plaintiff (Docs. 60 & 61).

Plaintiff's amended complaint alleges that Defendant discriminated against him on the basis of his race.[1] (Doc. 14) He contends that his work environment was hostile due to his race and that he was denied a promotion because of his race. He also alleges a cause of action under the Fair Labor Standards Act ["FLSA"] for unpaid wages.

Both Plaintiff and Defendant contend that they are entitled to judgment as a

---

[1]Plaintiff's amended complaint also contains a claim of retaliation.    This claim has been dismissed. (Doc. 44).

matter of law on all claims.  For the reasons set forth below, Plaintiff's motion for summary judgment is due to be denied; Defendant's motion for summary judgment is due to be granted in part and denied in part.  Plaintiff's motion to strike and Defendant's motions to strike are due to be denied in part and granted in part.

## I.   MOTIONS TO STRIKE

### A.   PLAINTIFF'S MOTION TO STRIKE

Plaintiff has filed a motion to strike the portion of Robert Hilton-Lee's declaration that states that he considered Plaintiff for the temporary T3 position in February 2000.  Plaintiff contends that this statement contradicts Hilton-Lee's deposition testimony.  However, the Court finds that this statement is supported by Hilton-Lee's testimony when read in its entirety.  *See* Doc. 50, Exh. F, pp. 78-80.

Therefore, Plaintiff's motion to strike portions of Hilton-Lee's declaration (Doc. 51) is due to be denied.

### B.   DEFENDANT'S MOTIONS TO STRIKE

Defendant has filed two motions to strike portions of affidavits submitted by Plaintiff. (Doc. 60 and 61)  The only difference between these two motions is that the second motion also moves to strike portions of Plaintiff's affidavit.  Therefore, Defendant's first motion to strike (Doc. 60) is due to be denied as moot.  Defendant's second motion to strike is due to be granted in  part and denied in part.

A portion of paragraph 18 of Plaintiff's affidavit is due to be stricken.  Plaintiff's affidavit states that he complained about Byrd using racial epithets "at least ten

times." Plaintiff testified that he recalled complaining to Cunningham more than once and that he could recall the content of one of those complaints. Therefore, the Court has considered Plaintiff's testimony that he complained of Byrd's racial epithets but has not considered his testimony that he complained "at least ten times."

Although the Court finds that much of Plaintiff's affidavit is vague and speculative and that some statements lack a proper foundation, the Court has chosen to consider the rest of Plaintiff's affidavit for what it is worth.

Likewise, the Court finds that much of the affidavits of Shawn Nix, Bruce Johnson, Henry Cunningham, and Victor Wilson are vague and speculative and that many of the statements lack proper foundation. Nevertheless, the Court has chosen to consider these affidavits for what they are worth. Therefore, the remainder of Defendant's motion to strike (Doc. 61) is due to be denied.

## II.  **MOTIONS FOR SUMMARY JUDGMENT**

### A.   **SUMMARY JUDGMENT STANDARD**

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; 106 S. Ct. at 2553;  *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial."  *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994).  In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)).

## B.   STATEMENT OF FACTS

Plaintiff Parnell Turner is a black male.  Plaintiff began his employment with Defendant NHB Industries, Inc., on October 19, 1998.  Defendant manufactures residential cabinets for sale to large national retailers.  During the relevant time

period, Plaintiff worked in the lamination department. The lamination department employs approximately twelve employees, working three shifts. Those employees are responsible for laminating large quantities of raw board using a large electrical and mechanical press. The production manager for the Lamination, during the relevant time, was Robert Hilton-Lee. The lamination department employees fall into the following employment classifications: T3, G5, and G2/G3.

Plaintiff contends that a T3 is an assistant supervisor for production, who is accountable for the performance of the employees on his shift, including reporting absenteeism and for recommending disciplinary action to the production manager. Defendant contends that T3 employees are not considered supervisors, and they are responsible for overseeing the operation of the press and the movement of the board, maintaining the work schedule, and insuring the quality of the laminated board. Defendant's Company Handbook classifies the T3 positions as "Maintenance Senior Level and Extremely Technical Machine Operators – Both electrical and mechanical personnel with normally at least ten (10) years of manufacturing maintenance experience or equivalent. These employees are expected to work independently and lead teams." Doc. 50, Exh. D, exh. 7, p. 20. T3 employees are in charge of their shift, and they direct the work of the employees on that shift, and they can initiate discipline. During the events in question, the T-3 employees in the lamination department were Joe Culpepper (white male), Kim Crimm (white male), Tim Byrd (white male), and Henry Cunningham (black male).

A G5 employee is a line operator who reports to the T3 employee, monitors the production line, makes adjustments to optimize efficiency, loads the paper onto the line, makes any alignment adjustments, carries out quality checks on the product, keeps correct records, and maintains general housekeeping of the area around the lamination line. While running the lamination line is the responsibility of the T3 employee on that shift, the duties and training for a G5 position and a T3 position are comparable. Plaintiff was classified as a G5 employee during the events in question.

The G2/G3 positions are divided into quality inspectors and material handlers. The quality inspector reports to the T3 employee, monitors the rear of the line press, inspects finished boards according to quality standards, records output, communicates with the G5 employee and the T3 employee on operation of the back end, labels finished stock, and maintains general housekeeping of the back of the line. The material handler takes instruction from and reports to the T3 employee, straps finished boards, moves the stacks to the warehouse, loads raw material onto the line, and maintains general housekeeping around the strapping area.

Defendant has a "No Harassment Policy." The policy provides that it "is the responsibility of every supervisor and manager to communicate this policy with their employees." Doc. 50, Exh. D, exh. 5. Henry Polek, the human resources director, could not recall if he reviewed the "No Harassment" with Plaintiff or other employees in the lamination department. However, Plaintiff received a copy of the Employee

Handbook, the policies were posted on the main employee bulletin board near the cafeteria, and Plaintiff was aware that there was a policy that prohibited harassment in the workplace.

The policy provides that "harassment" includes, but is not limited to, offensive language, jokes, or other verbal graphic or physical conduct; or intimidating, threatening, or offensive behavior relating to an employee's race that would lead a reasonable person to feel uncomfortable.  Conduct in violation of this policy could result in disciplinary action, and the level of discipline is based on the severity of the harassment and the harasser's employment history and may include termination.

There are several reporting avenues available to Defendant's employees in the event they believe they have been subjected to unlawful discrimination or harassment.  These avenues include: (a) reporting the conduct to the employee's supervisor or another member of management; (b) reporting the conduct to the Human Resources Manager; or (c) reporting the conduct to the Plant Manager. Defendant's anti-harassment policy expressly states: "No supervisor or manager should participate in such behavior and must take immediate action to stop those who are known to be, or suspected of being, involved in such conduct.  The supervisor must also contact and report the information to the Human Resources Manager."  Doc. 50, Exh. D, exh. 5, p. 2.  Plaintiff acknowledges that, if he believed he had been discriminated against, he could report it to any of the individuals described above.

Page 7 of  26

The posted anti-harassment policy specifically prohibits the use of "words . . . that others could interpret as being insulting, derogatory, or slurs towards persons based upon their race [or] color . . . ." *Id.* at 2.  The policy explicitly states that such language "will not be tolerated." *Id.*  In its commitment to enforce this prohibition, Defendant explicitly prohibits retaliation. *Id.* at 5-6.  To ensure that corrective action is taken, the anti-harassment policy clearly states that, "Anyone who feels the Company has not met its obligations under this policy should contact the Human Resources Manager." *Id.* at 4.

An additional avenue for reporting concerns is available under the Defendant's "Open Door Policy," which is contained in the handbook.  Doc. 50, Exh. D, exh. 7, p. 14.  That policy specifically states that complaint procedures (such as those contained in the anti-harassment policy) are published separately and posted in the individual work areas.

Plaintiff contends that he was regularly exposed to conduct in violation of this policy.  Defendant denies this contention.  Plaintiff's amended complaint alleges two general incidents that created a hostile work environment: (1) repeated racial epithets from Tim Byrd, T3 employee on the third shift, which Byrd denies; and (2) racially segregated shifts.   In his brief, Plaintiff alleges other incidents of harassment. Because Plaintiff's amended complaint clearly limits his allegations to these two incidents, other evidence will not be considered by the Court in determining whether Plaintiff's work environment was sufficiently hostile or abusive.

Plaintiff contends that Byrd used the "N" word and the word "boy" on a regular and repeated basis to refer to black people.  Byrd denies using any racial epithets in the workplace.  This was the only type of harassing conduct in which Byrd engaged, according to Plaintiff's amended complaint.  Moreover, it is undisputed that Plaintiff only worked with Byrd briefly and that Plaintiff avoided Byrd.

Plaintiff complained about Byrd's frequent, at-will use of the "N" word to Henry Cunningham, the T3 employee on Plaintiff's shift.  Plaintiff contends that Hilton-Lee was present when he complained to Cunningham, but Hilton-Lee denies that anyone complained to him about Byrd's racial remarks.

Plaintiff testified that hearing the N-word hurt his feelings and made him angry.  He further testified that, although he did not feel threatened by Byrd, he did not trust him.  According to Plaintiff, he asked Byrd not to use such language, but Byrd continued.  Byrd denies using any racial epithets in the workplace.

Defendant's "anti-harassment" policy provides that a supervisor must take immediate action to stop conduct that violates the policy and that he must report conduct in violation of the policy to the human resources manager, which was Polek.  Neither Cunningham nor Joe Culpepper, another T3 employee who allegedly heard Byrd use the "N" word reported any violation of the policy to Polek.

Plaintiff was aware of the policy reporting procedures.  He acknowledges that he saw Hilton-Lee at work every day.  He also knew Hilton-Lee was the head of the lamination department, however, he did not think complaining to Hilton-Lee about

Byrd's use of racial epithets would do him any good because Hilton-Lee promoted Byrd to the T3 position ahead of him and because Hilton-Lee overworked Bruce Johnson, another black Lamination employee.

Instead of reporting Byrd's racial epithets to Hilton-Lee, or Polek, Plaintiff reported the conduct to Henry Cunningham, the T3 on his shift, whom he considered to be his immediate supervisor. Defendant denies that T3 employees are supervisors. When Plaintiff complained to Cunningham about Byrd's use of racial epithets, Cunningham told him that he had also noticed it. Plaintiff could not recall the specific details of his conversation with Cunningham, and he could not recall if Cunningham indicated he would talk to Hilton-Lee or Polek about Plaintiff's concerns. In Plaintiff's opinion, he did not need to report the purported harassment to anyone else after he reported it to Cunningham.

Cunningham claims he, Nix, and Turner "talked to Bob [Hilton-Lee] . . . about Tim Byrd using [the "N" word] and everything that went on in that plant . . ." approximately "twice a week." Doc. 47, Exh. 5, p. 147-48. He testified that in these conversations, "most of the time . . . we did not name specific incidents that had happened with him using the 'N' word." *Id.* at 142.

During Plaintiff's employment in the lamination department, there was a time when there was an all black second shift and an all white third shift. Also during this time, the first shift was integrated. Defendant contends that this was the result of routine hiring progression. For a time Plaintiff worked on an all black shift. Plaintiff

contends that when Defendant hired a new white employee for the lamination department, Hilton-Lee assigned Victor Wilson, a black employee, to the all black shift "to keep down confusion." (Doc. 47, Exh. 18, ¶ 30) Defendant denies that Hilton-Lee ever assigned Wilson to an all black shift or that he ever said that such was done to keep down confusion. Also, Defendant contends that the second and third shifts were segregated due in part to the granting of requests from black employees to move from the third shift to the second shift.

For example, Nix (a black male), who had been working on the third shift, requested a transfer to the second shift and such transfer was granted. Also, Wilson testified that he had asked to move off third shift because of Byrd and that he had asked to move to second shift.

At all times, lamination department employees are compensated for their "working" time spent in the lamination department during the regularly scheduled shift. The lamination department is housed in a building separate from the rest of the plant, approximately 1300 feet from the time clock in the main plant. The walk from the time clock in the main building to the lamination department is 5-15 minutes. An employee in the lamination department is required to be clocked in and present at the lamination facility at the time his shift is scheduled to begin. Plaintiff was not compensated by Defendant for time on the clock that he spent walking to and from the lamination facility and the main building.

On August 31, 2000, the following memorandum was sent by Hilton-Lee to

Page 11 of  26

all employees of the lamination department:

"On time and present for work means an employee is clocked in and at his or hers [sic] place of work when the buzzer sounds for start of shift.

Therefore all Lamination personnel have to be clocked in and down at the Lamination building ready to start work at the start of their shift. You should not leave the production area until the end of the shift.

You should allow 10 mins to walk to your place of work, (Lamination area) your punch times should reflect this allowance.

For example, if your shift is 6 am to 2 pm. your punch should show 5.50 am - 2.1 pm, this will cover a full 8 hours employment and pay. If your punch records 6 am - 2 pm you will only cover a period of 6.1 am to 1.5 pm.

Doc. 50, Exh. F, exh. 5. Defendant contends, and Plaintiff disputes, that Polek

repealed this directive on September 4, 2000. A manual time clock was installed

at the lamination facility on or about April 10, 2001.

Although Plaintiff was a G5, he performed some duties associated with the

T3 position on several occasions, such as performing maintenance on the

Lamination Press and running a shift. In February 2000, a temporary T3 position

became available on the third shift. Defendant admits the position was not posted,

but it contends that the third-shift position was temporary, and, therefore, was not

required to be posted.

Defendant maintains a job posting policy that is contained in both the current

and former Company Handbooks. The relevant policies require posting only for

"permanent positions." Vacant jobs that are classified G3 or higher are posted on

the main employee bulletin board for three consecutive work days.  Qualified employees are eligible to bid on open positions.  Defendant gives its management discretion to make temporary job assignments for up to 30 days without regard to job classification.  Under the job posting policy, the department supervisor selects the individual whom he believes is most qualified to fill the open position.  According to the policy, "If two or more candidates are equally qualified, then seniority will also be a deciding factor.  Attendance, disciplinary action and written performance appraisals will be considered qualifying factors during the decision process."  Doc. 50, Exh. D. exh. 7, p. 20.

Instead of posting the position, Hilton-Lee asked Tim Byrd, a white G5 employee to assume the T3 third-shift position.  Hilton-Lee testified that he considered all the G5 employees in the lamination department for the temporary third-shift position and that he chose Byrd because of his superior qualifications and seniority.[2]

Prior to becoming an employee of Defendant, Plaintiff had negligible experience working in a manufacturing environment.  Defendant hired Plaintiff as a first shift G1 employee in the panel processing department on October 16, 1998. In late October 1998, Plaintiff transferred to the lamination department as a second shift G2 forklift operator/inspector.  On July 13, 1999, Plaintiff was reassigned from

---

[2]Plaintiff contends that, because Byrd worked in the "temporary" position for more than 30 days that the position was "permanent" and should have been posted.

G2 to G5 "as [an] exception to general job posting procedures." Doc. 50, Exh. D., exh. 12. Plaintiff's performance evaluations for this period contain the following coaching points: "needs to improve and is able to, must keep production area cleaner . . . needs to improve and can" (Doc. 50, Exh. D, exh. 11); "needs to follow through on QC issues" (*id*. exh. 13); "needs to increase speed in which line adjustments are made . . . needs to plan and facilitate the process of changing orders better . . . needs to take control and direct those under him." (*id*. exh. 15); "has room to improve, needs to lead rather than follow" (*id*. exh. 21). Also, Plaintiff's personnel file contained two written warnings for absenteeism, as well as a written warning for tardiness and insubordination.

Byrd, on the other hand, had 17 years of experience in operating a press before he came to work for Defendant. Though Defendant's lamination process differed somewhat from Byrd's traditional printing press experience, Byrd had extensive knowledge of hydraulics, as well as operating, trouble-shooting, and repairing heavy machinery. In Hilton-Lee's opinion, Byrd's prior experience operating high-speed presses, his demonstrated skills and abilities in performing his job duties in the lamination department, along with his excellent work record, qualified him for this temporary T3 position ahead of Turner and Hall. Additionally, according to Hilton-Lee, Byrd had greater length of service and G5 seniority over either Plaintiff or Wendall Hall, the other G5 in the lamination department. Also, prior to his elevation to the T3 position, Byrd had no adverse write-ups in his

personnel file.

Defendant promoted Byrd to the T3 position in February 2000, despite the fact that he had not been trained to do the job of a T3.  Henry Cunningham trained both Plaintiff and Wendell Hall on the duties and responsibilities of a T3 employee by allowing them to run the Lamination line, but Cunningham never saw Byrd run the line prior to being made a T3 employee.

After Byrd assumed the T3 position on third shift in February 2000, he and Plaintiff did not regularly work together as Plaintiff was on the second shift. Occasionally Plaintiff would see Byrd if he came in early, before third-shift began.

Plaintiff contends, and Defendant does not dispute, that Hilton-Lee assigned Byrd to this position to "put him in a good position if a permanent position at this grade should become available."  Doc. 47, Exh. 36.  In May 2000, Byrd was made a permanent T3 employee.  Defendant contends, and it appears undisputed, that it posted the permanent T3 position.  Plaintiff testified that he did not see the job posting.  Byrd was the only employee to bid on the permanent position in May 2000, which he was awarded.

On August 7, 2000, the black employees of the lamination department sent a letter to Polek complaining of race discrimination.  The letter stated:

> The purpose of this letter is to raise concerns of race discrimination in the assignment of jobs, shifts, pay, discipline and hiring, and to request an immediate investigation into these allegations.
>
> In the lamination department, the employee handbook is not

followed with respect to the posting and filling of positions. Qualified black employees are not given an opportunity to bid on jobs, and white employees from outside the company are brought in at a higher grade to fill these positions, despite the standing application of qualified black employees. As a consequence, black employees are put on less desirable shifts. Likewise, the black employees are given twice the work load of similarly situated white employees. This is true across the board and affects all black employees in the lamination department. All hiring decisions and shift assignments for the last two (2) years should be reviewed.

. . .

[B]lack employees are disciplined at a higher rate than white employees in the lamination department. Also, other terms and conditions of employment are handled in a disparate manner between blacks and whites. The shifts in the lamination department are racially segregated. Black employees are asked to assume duties and responsibilities beyond their job descriptions, where white employees are not.

Race discrimination permeates the environment of the lamination department, and all aspects of the employment environment should be investigated for race discrimination. Numerous black employees have come to you complaining about Bob Hilton Lee's unfair treatment of black employees as compared to white employees, yet no action has been taken. This can only be interpreted as the company's complacency towards and endorsement of racially discriminatory employment practices.

Furthermore, employees who have complained of unfair employment practices have suffered adverse employment action in response to their complaints. The black employees in the lamination department request assurances that they will not suffer any retaliation in response to this complaint.

We request a written report detailing your findings of your investigation and who was involved in the investigation by Monday, August 14. If no investigation is conducted, we would request a written explanation as to why by the same date.

Page 16 of 26

Sincerely,

The Black Employees in the Lamination Department.

Doc. 47, Exh. 25.

In response to the letter, Polek interviewed the black employees in the lamination department.  He did not interview Byrd, Hilton-Lee, or other white employees.  When Polek asked Plaintiff about the letter, Plaintiff denied that he had any knowledge of the letter; however, in his deposition, he testified that he had reviewed the letter before it was sent to Polek.  When questioned by Polek during his investigation of the letter, Plaintiff voiced complaints over Byrd's promotion, but he did not tell Polek about Byrd's use of racial epithets.

Polek told Hilton-Lee about the letter and he asked him not to discuss the letter with anyone.  Nevertheless, Hilton-Lee told Cunningham that he believed that "hiding behind an anonymous letter was a cowardly thing to do."  Doc. 50, Exh. F, p. 72.  According to Cunningham, Hilton-Lee also stated that "once he found out who exactly wrote the letter, he would be taking actions of his own."  Doc. 47, Exh. 5, p. 162.  However, after the letter was sent, Hilton-Lee did not treat Plaintiff differently.

During Polek's investigation of the letter, two black lamination department employees, Hall and Cunningham, indicated to him that Byrd had used the N-word on the job in a joking manner.  With the exception of Plaintiff, all other lamination department employees told Polek that Byrd had threatened to "slap Bruce's black

ass.  Based upon this information, Polek gave Byrd a final written warning, which stated in  pertinent part, "This is a very serious violation of NHB Policy regarding harassment and will not be tolerated.  Any further breach of Company policy may result in further disciplinary action up to and including termination."  Doc. 50, Exh. G, exh. 6.  Byrd testified that, after he received this warning, he did not "speak to anybody . . . for three months."  Doc. 50, Exh. G, p. 63.  Cunningham testified that after Byrd was disciplined, everything in the lamination department got "hush hush" and he could not recall Byrd saying the N-word in his presence.  Doc. 47, Exh. 5, pp. 155-56.

On or about March 16, 2001, Eddie Scales, a black employee who worked in the lamination department from mid-September 1999 to mid-January 2000, reported to Polek that he had heard Byrd frequently use the N-word while he was employed there.  As a result of Scales's complaint, Polek again interviewed all lamination department employees, including Plaintiff.  During that interview, a number of lamination department employees, including Plaintiff, confirmed to Polek that they had heard Byrd repeatedly use the N-word.  As a result of Polek's investigation of Scales's complaint, Defendant terminated Byrd based upon his violation of Defendant's policy prohibiting workplace harassment.

## B.    HOSTILE ENVIRONMENT

The Court finds that there are disputed issues of material fact as to whether Plaintiff was subjected to a hostile work environment and whether Defendant is entitled to a *Faragher* affirmative defense and that neither party is entitled to judgment as a matter of law.[3]   Therefore, Plaintiff's motion for summary judgment and Defendant's motion for summary judgment with regard to Plaintiff's hostile environment claim are due to be denied.

## C.    PROMOTION

Plaintiff contends that Tim Byrd was promoted to the T3 position for third shift in February or March of 2000.  Plaintiff contends that, contrary to Defendant's policy, this position was not posted and he was not allowed to apply for this position.  He contends that he was more qualified than Byrd and that he was denied the promotion on the basis of his race.  Defendant contends that Byrd was temporarily assigned the T3 position in February 2000 because Hilton-Lee, the decision-maker, believed that Byrd was the most qualified.  Moreover, Defendant contends that in

---

[3]The Court notes that Plaintiff's amended complaint limits his allegations of a hostile work environment to conditions created by racially segregated shifts and racial epithets made by Tim Byrd. *See* Doc. 14, ¶¶ 10-14. However, on summary judgment, Plaintiff also contends the following conduct attributed to the hostile environment: disparate discipline with regard to Defendant's attendance policy, disparate treatment of black workers by Defendant's security, and racial remarks made by employees other than Byrd.  These incidents were not included in Plaintiff's amended complaint and cannot be read into his amended complaint.  Because Plaintiff's amended complaint clearly limits the incidents creating a hostile environment to segregated shifts and Byrd's alleged racial epithets, the other incidents alleged by Plaintiff have not been considered by the Court as contributing to the alleged hostile work environment.

May 2000, when the temporary T3 position was made permanent, the position was posted, and Byrd was the only person that applied for the position.   Plaintiff contends that he did not see the position posted.

Plaintiff must establish four elements of a prima facie case for a failure to promote claim: (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for and applied for the available position; (3) Plaintiff was rejected despite his qualifications; and (4) Defendant filled the position with a person outside the protected class with equal or lesser qualifications or continued to seek other applicants after rejecting Plaintiff. *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir.1998), *cert. denied*, 528 U.S. 809, 120 S. Ct. 39, 145 L. Ed. 2d 36 (1999).  If the employer does not post the positions, Plaintiff is not required to show that he applied for the position. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1130-31 (11th Cir.1984).  If an employer fails to use some sort of notice procedure, then it has a duty to consider everyone who might be interested in the position. *Hanley v. Sports Authority*, 143 F. Supp. 2d 1351, 1358 (S. D. Fla. 2000).

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.   If the employer meets this burden of production, the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105

(2000).

"In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000)(en banc)(citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997)(requiring a plaintiff to rebut "all of the defendant's proffered nondiscriminatory reasons for its actions" to avoid judgment as a matter of law), *cert. denied sub nom.*, *Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998)).

The temporary T3 position, awarded to Byrd in February 2000, was not posted, but Defendant has presented evidence, undisputed by Plaintiff, that Plaintiff was considered for the temporary position.[4]

---

[4]Actually, in brief, Plaintiff contends that Hilton-Lee testified that he did not consider Plaintiff for the temporary T3 position. This assertion is either an attempt to mislead the Court as to the nature of Hilton-Lee's complete testimony or an inaccurate understanding of that testimony. Hilton-Lee testified:

Q.   How did Tim Byrd become a T-3?

A.   We had a requirement to start a third shift pretty immediately. I did a lateral assignment within the department. I moved him the same – you know, just moved him into that assignment and, basically, to hold that position as a temporary sort of thing. It later evolved that we posted the job, and he applied for it.

Q.   How long did he hold the job before it was posted?

A.   I don't recall exactly . . . .

Q.   Who else was considered for that T-3 position besides Mr. Byrd?

Defendant contends that it selected Byrd for the temporary position because he had superior qualifications. In a failure to promote case, when Defendant contends that the person promoted was more qualified than Plaintiff, Plaintiff, in order to establish a question of fact as to whether Defendant's articulated reason is a pretext, must show that he was "so clearly more qualified for the position than [the person promoted] that a reasonable juror could infer discriminatory intent from

_____

A.    Any applicants that applied for it.

Q.    Who would that have been?

A.    I don't think anybody else applied.

Q.    Who else was considered for the temporary T-3 position?

A.    Nobody.

Q.    Why was Mr. Byrd given that the temporary position as opposed to another employee?

A.    In my opnion, which is part of my job function to make these recommendations, he was the best qualified to carry out those tasks and meet the criteria.

Q.    Who else did you consider for the temporary T-3 position?

. . .

A.    I considered to myself the other members of the department.

Q.    Who would that have been?

A.    That would have been Parnell Turner, Shawn Nix, Wendall Hall. Sorry, not Shawn Nix. I was thinking Wendall Hall on that time. G-5s in other words.

Doc. 50, Exh. F, pp. 78-80.

the comparison." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1255 (11th Cir. 2000)(citing *Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir.2000); *Deines v. Texas Dept. of Protective and Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir.1999); *Simms v. Oklahoma ex rel. Department of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1329-30 (10th Cir.), *cert. denied*, 528 U.S. 815, 120 S. Ct. 53, 145 L. Ed. 2d 46 (1999)). Plaintiff has not offered any such evidence sufficient to support an inference that the articulated reason for Byrd's promotion in February 2000 was a pretext for race discrimination.[5]

Therefore, Defendant's motion for summary judgment is due to be granted as to Plaintiff's promotion claim relating to the February 2000 T3 position. Plaintiff's motion as to this claim is due to be denied.    The Court finds no disputed issues of material fact and that Defendant is entitled to judgment as a matter of law.

With regard to the May 2000 permanent position, the Court notes that Plaintiff does not complain about this promotion in his amended complaint. Moreover, Defendant has presented evidence that the permanent T3 position was posted in

---

[5]Plaintiff contends that Defendant has not offered a legitimate nondiscriminatory reason for the February 2000 promotion decision. According to Plaintiff's briefs, Hilton-Lee testified that he had not considered anyone other than Byrd for that position. Therefore, Defendant cannot offer relevant qualifications as its articulated reason for not selecting Plaintiff because Hilton-Lee did not consider qualifications. However, read in its entirety Hilton-Lee testified that he did not consider Plaintiff for the May 2000 position, because he did not apply, but that he did  consider him for the temporary position in February 2000. *See* Doc. 50, Exh. F, pp. 78-80.

Page 23 of  26

May 2000, but that Plaintiff did not apply.[6]  Therefore, it argues that Plaintiff cannot make a prima facie showing with regard to the permanent T3 position.

Plaintiff has  not presented evidence that he applied for the T3 position in May 2000, when the position was posted, or that he was excused from so doing. *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 963 (11th Cir.1997); *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1132-1133 (11th Cir.1984).  Defendant posted the available position and accepted bids.  Plaintiff did not bid on the job; therefore, he cannot show a prima facie case of race discrimination with regard to the May 2000 position. *Harris v. Warehouse Services, Inc.*, 77 F. Supp. 2d 1240, 1246-47 (M.D. Ala. 1999).

Defendant's motion for summary judgment as to Plaintiff's May 2000 promotion claim is due to be granted and Plaintiff's motion for summary judgment as to this claim is due to be denied.  The Court finds no disputed issues of material fact and that Defendant is entitled to judgment as a matter of law.

### D.    FAIR LABOR STANDARDS ACT

In his amended complaint, Plaintiff claims that he was not paid for the time it took him to walk from the location of the time clock in the main building to the lamination building where he actually worked.  Plaintiff relies upon *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946) to

---

[6]Plaintiff contends that he was not aware that the position was posted in May 2000. However, he has produced no credible evidence that the May 2000 position was not posted.

Page 24 of  26

support his position that such time is compensable.  However, in response to the

*Anderson* decision, Congress passed the Portal-to-Portal Act, which states, in

pertinent part:

> (a) Activities not compensable
>
> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938 . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947 –
>
>> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform . . . .

29 U.S.C. § 254(a)(1).

Pursuant to the Portal to Portal Act, Plaintiff is not entitled to compensation

for the time spent walking to the place of his "principal activity," which is the

lamination department.   *See United Transp. Union Local 1745 v. City of*

*Albuquerque*, 178 F.3d 1109, 1120-21(10th Cir. 1999); *Carter v. Panama Canal Co.*,

463 F.2d 1289, 1292-94 (D.C. Cir.), *cert. denied*, 409 U.S. 1012, 93 S. Ct. 441, 34

L. Ed. 2d 306 (1972).

Therefore, Defendant's motion for summary judgment as to Plaintiff's FLSA

claim is due to be granted and Plaintiff's motion for summary judgment is due to be

denied.  The Court finds no disputed issues of fact and that Defendant is entitled to

judgment as a matter of law.

## CONCLUSION

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. 45) is due to be denied; Defendant's motion for summary judgment (Doc. 48) is due to be granted in part and denied in part; Plaintiff's motion to strike a portion of Hilton-Lee's declaration (Doc. 51) is due to be denied; Defendant's motion to strike portions of affidavits submitted by Plaintiff (Doc. 60) is due to be denied as moot; and, as set forth above, Defendant's motion to strike portions of affidavits submitted by Plaintiff (Doc. 61) is due to be granted in part and denied in part.  The Court finds disputed issues of material fact as to Plaintiff's racially hostile work environment claim and that neither party is entitled to judgment as a matter of law as to this claim. However, with regard to Plaintiff's promotion claim and his FLSA claim, the Court finds no disputed issues of material fact and that Defendant is entitled to judgment as a matter of law.

The Court will enter a separate order, contemporaneously herewith, in accordance with this memorandum opinion.

DONE this 24th day of October, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE